# 21-2786-cv

## United States Court of Appeals

*for the*

## Second Circuit

RISEANDSHINE CORPORATION, DBA Rise Brewing,

*Plaintiff-Appellee,*

— v. —

PEPSICO, INC.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR DEFENDANT-APPELLANT

MACEY REASONER STOKES
CHRISTOPHER E. TUTUNJIAN
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1234

DALE M. CENDALI
LUKE ALI BUDIARDJO
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

JULIE M.K. SIEGAL
KIRKLAND & ELLIS LLP
1301 Pennsylvania, NW
Washington, DC 20004
(202) 389-5000

*Attorneys for Defendant-Appellant PepsiCo, Inc.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellant PepsiCo, Inc. certifies that it does not have any parent corporation, and that no publicly held companies own 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ..................................................................1

ISSUES PRESENTED................................................................................1

INTRODUCTION .....................................................................................2

STATEMENT OF THE CASE.......................................................................10

    I.    Factual Background......................................................................10

        A.    RBC Entered a Crowded Field With Its Choice of Trademark ....................................................................10

        B.    RBC's Representations To The PTO.........................................12

        C.    RBC Unsuccessfully Pursued Acquisition By PepsiCo ...........15

        D.    PepsiCo Independently Developed A New Energy Drink For Its MTN DEW Product Portfolio ........................16

        E.    RBC Sent A Demand Letter And Then Went Silent ................20

        F.    RBC Demanded A Windfall Following PepsiCo's Launch ....................................................................22

    II.    Procedural Background ..................................................................23

SUMMARY OF ARGUMENT .....................................................................24

STANDARD OF REVIEW .........................................................................26

ARGUMENT ..........................................................................................27

    I.    RBC Is Unlikely To Succeed On The Merits .....................................27

        A.    The District Court Improperly Analyzed The "Strength" Factor...................................................................30

        B.    The Marks Are Not Similar .....................................................37

        C.    PepsiCo Decisively Proved Lack Of Actual Confusion ..........45

ii

1. PepsiCo Proved The Absence Of Actual Confusion ...... 46

2. The District Court Improperly Considered RBC's Anecdotal Evidence, Which Was Not Probative Of Reverse Confusion .......................................................... 50

D. The Products Are Not Proximate ............................................... 54

E. RBC Failed To Present Evidence As To "Bridging The Gap" ....................................................................................... 57

F. The District Court Incorrectly Analyzed The "Quality" Factor ..................................................................................... 58

G. The "Bad Faith" Factor Favors PepsiCo .................................... 58

H. RBC Failed To Introduce Evidence As To Buyer Sophistication ......................................................................... 59

I. Balancing the Factors Shows The Absence Of Confusion ....... 59

II. RBC Would Not Suffer Irreparable Harm Absent An Injunction ...... 60

III. The Balance Of Hardships Favored PepsiCo ...................................... 63

IV. The Public Interest Weighed Against Injunctive Relief .................... 65

CONCLUSION ............................................................................................. 67

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
  537 F.2d 4 (2d Cir. 1976) ...................................................................30

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ...........................................................63

*Arrow Fastener Co. v. Stanley Works*,
  59 F.3d 384 (2d Cir. 1995) ...........................................................42, 44

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
  973 F.2d 1033 (2d Cir. 1992) .......................................................26, 27

*Century Time Ltd. v. Interchron Ltd.*,
  729 F. Supp. 366 (S.D.N.Y. 1990) ................................................61, 62

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985) .........................................................62, 63

*Citigroup Inc. v. AT&T Servs., Inc.*,
  No. 16-cv-4333, 2016 WL 4362206 (S.D.N.Y. Aug. 11, 2016) .......................49

*Courtenay Commc'ns Corp. v. Hall*,
  No. 01-cv-2228, 2007 WL 2089359 (S.D.N.Y. July 20, 2007) ........................59

*Essence Commc'ns., Inc. v. Singh Indus., Inc.*,
  703 F. Supp. 261 (S.D.N.Y. 1988) .....................................................50

*Estee Lauder Inc. v. The Gap, Inc.*,
  108 F.3d 1503 (2d Cir. 1997) ...........................................................37

*Freedom Card, Inc. v. JPMorgan Chase & Co.*,
  432 F.3d 463 (3d Cir. 2005) ...............................................34, 35, 58

*Gruner + Jahr USA Publ'g v. Meredith Corp.*,
  991 F.2d 1072 (2d Cir. 1993) ..................................................*passim*

*Hamilton Int'l Ltd. v. Vortic LLC*,
    13 F.4th 264 (2d Cir. 2021) ................................................................57

*J.T. Colby & Co. v. Apple Inc.*,
    No. 11-cv-4060, 2013 WL 1903883 (S.D.N.Y. May 8, 2013).........42, 43, 44, 59

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
    58 F.3d 27 (2d Cir. 1995) ..................................................................65

*Joules Ltd. v. Macy's Merch. Grp., Inc.*,
    695 F. App'x 633 (2d Cir. 2017) ........................................................48

*King Rsch., Inc. v. Shulton, Inc.*,
    454 F.2d 66 (2d Cir. 1972) ................................................................42

*Koninklijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*,
    No. 11-cv-3684, 2017 WL 3719468 (D.N.J. Aug. 29, 2017)............................47

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
    113 F.3d 373 (2d Cir. 1997) ..............................................................45

*Lang v. Ret. Living Publ'g Co.*,
    949 F.2d 576 (2d Cir. 1991) ......................................................*passim*

*Lever Bros. Co. v. Am. Bakeries Co.*,
    693 F.2d 251 (2d Cir. 1982) ........................................................28, 33

*Life Techs. Corp. v. AB Sciex Pte. Ltd.*,
    No. 11-cv-325, 2011 WL 1419612 (S.D.N.Y. Apr. 11, 2011)............................62

*LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016) ..................................................30

*Majorica, S.A. v. R.H. Macy & Co.*,
    762 F.2d 7 (2d Cir. 1985) ..................................................................62

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)..........................................................................27

*Merriam-Webster, Inc. v. Random House, Inc.*,
    35 F.3d 65 (2d Cir. 1994) ............................................................46, 52

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) ................................................27

*Nabisco, Inc. v. Warner-Lambert Co.*,
220 F.3d 43 (2d Cir. 2000) ..........................................*passim*

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
269 F.3d 114 (2d Cir. 2001) ...........................................28, 45, 53, 54

*Playtex Prods., Inc. v. Georgia-Pacific Corp.*,
390 F.3d 158 (2d Cir. 2004) ................................................45

*Plus Prods. v. Plus Disc. Foods, Inc.*,
722 F.2d 999 (2d Cir. 1983) ...........................................31, 33, 40

*Polaroid Corp. v. Polarad Elecs. Corp.*,
287 F.2d 492 (2d Cir. 1961) ..........................................*passim*

*Procter & Gamble Co. v. Johnson & Johnson Inc.*,
485 F. Supp. 1185 (S.D.N.Y. 1979) ....................................33, 34, 42

*Riseandshine Corp. d/b/a Rise Brewing v. Hendricks*,
No. 1:21-cv-00232 (W.D.N.C. Aug. 1, 2021) ..................................35

*Savin Corp. v. Savin Grp.*,
391 F.3d 439 (2d Cir. 2004) ................................................58

*Star Indus., Inc. v. Bacardi & Co.*,
412 F.3d 373 (2d Cir. 2005) ...........................................30, 38, 44, 50

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
588 F.3d 97 (2d Cir. 2009) ...........................................35, 38, 43, 45

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
No. 86-cv-6159, 1987 WL 6300 (N.D. Ill. Jan. 30, 1987) ..........................61, 64

*Streetwise Maps, Inc. v. VanDam, Inc.*,
159 F.3d 739 (2d Cir. 1998) ...........................................28, 31

*Tiffany & Co. v. Costco Wholesale Corp.*,
971 F.3d 74 (2d Cir. 2020) ................................................27

*Tough Traveler, Ltd. v. Outbound Prods.*,
    60 F.3d 964 (2d Cir. 1995) ...................................................................60, 63

*Trs. of Columbia Univ. v. Columbia/HCA Healthcare Corp.*,
    964 F. Supp. 733 (S.D.N.Y. 1997) ....................................................52

*Universal City Studios, Inc. v. Nintendo Co.*,
    746 F.2d 112 (2d Cir. 1984) ...............................................................44

*Vitarroz Corp. v. Borden, Inc.*,
    644 F.2d 960 (2d Cir. 1981) ...............................................54, 56, 57

*W. Publ'g Co. v. Rose Art Indus., Inc.*,
    910 F.2d 57 (2d Cir. 1990) .................................................................37

*W.W.W. Pharm., Co. v. Gillette Co.*,
    984 F.2d 567 (2d Cir. 1993) ...............................................................45

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................9, 27

**Statutes**

15 U.S.C. §1116 .......................................................................................60

15 U.S.C. §1121 .........................................................................................1

28 U.S.C. §1292 ......................................................................................1, 9

28 U.S.C. §1331 .........................................................................................1

28 U.S.C. §1332 .........................................................................................1

28 U.S.C. §1338 .........................................................................................1

28 U.S.C. §1367 .........................................................................................1

**Other Authorities**

Barton Beebe & Jeanne C. Fromer, Are We Running Out of
    Trademarks? An Empirical Study of Trademark Depletion and
    Congestion, 131 HARV. L. REV. 945 (2018) ......................................40

MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION (5th ed.)...................*passim*

Merriam-Webster, https://www.merriam-webster.com/dictionary/rise
(last visited Dec. 27, 2021) ..................................................................10

Defendant-Appellant PepsiCo, Inc. ("PepsiCo") appeals from the Order of the United States District Court for the Southern District of New York (Schofield, J.) granting Plaintiff-Appellee RiseandShine Corp.'s ("RBC") Motion for Preliminary Injunction.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over the claims arising under the Lanham Act pursuant to 15 U.S.C. §1121 and 28 U.S.C. §§1331 and 1338. The district court had supplemental jurisdiction over the claims arising under the laws of the state of New York pursuant to 28 U.S.C. §1367. The district court had jurisdiction over all claims pursuant to 28 U.S.C. §1332 as the parties are citizens of different states and the amount in controversy exceeds $75,000.

On November 3, 2021, the district court granted RBC's Motion for Preliminary Injunction and issued an order enjoining PepsiCo. SDNYDkt.148. On November 4, 2021, the court amended that order. [[Dkt.149.at.1-24.]] Defendant timely filed a notice of interlocutory appeal on November 4, 2021. CA2Dkt.1. This Court has jurisdiction pursuant to 28 U.S.C. §1292(a)(1).

## ISSUES PRESENTED

1. Whether the district court erred in determining that RBC was likely to succeed on the merits of its Lanham Act claims by establishing a likelihood of reverse confusion.

2.    Whether the district court erred in concluding that RBC would suffer irreparable harm absent an injunction.

3.    Whether the district court erred in finding that the balance of hardships and public interest favored the grant of a preliminary injunction.

## INTRODUCTION

Trademark law does not grant legal monopolies over common English words. It exists to protect against confusion in the marketplace. That is why courts conduct a vigorous, holistic analysis—first laid out in this Court's *Polaroid v. Polarad* decision—designed to investigate the numerous factors a consumer might consider when ascertaining the source of a product in the marketplace. Here, however, the district court found that PepsiCo's use of the MTN DEW RISE ENERGY mark for its fruit-flavored ***energy drink*** was "confusingly similar" to RBC's use of the RISE BREWING CO. mark for its ***coffee*** drink because both marks use the common English word "rise." In so doing, the court ignored the stark differences between the parties' two products, which are dissimilar in category, color scheme, iconography, size, marketing, font, and overall visual appearance. It did not even acknowledge that "rise" is a common English word that is therefore unlikely to confuse consumers. It misapprehended the substantial third-party use of the same word in trademarks for beverages and similar goods, which (as RBC admitted) means that numer-

2

ous "rise" marks can "peacefully coexist[] without confusion," even in the same category.  [[Dkt.108-6.at.4-5.]]  It failed to account for PepsiCo's use of its MTN DEW house mark on its MTN DEW products (including its new energy drink), which undercuts RBC's theory that consumers will believe that RBC's product (which does not include anything resembling the MTN DEW house mark) is the "***coffee version of Mountain Dew***."  Further, the court dismissed PepsiCo's survey evidence that decisively showed a complete lack of confusion, instead crediting a handful of uncorroborated anecdotes from RBC's own employees that, even if true, are not evidence of reverse confusion as a matter of law.

These are serious legal errors that disregard decades of this Court's trademark jurisprudence and divorce the infringement analysis from its intended purpose: to analyze the likelihood of confusion in the marketplace.  And, compounding these errors, the court ignored that RBC waited to bring its suit until ***after*** PepsiCo had launched its product with great fanfare to 170,000 stores nationwide (which should have precluded preliminary injunctive relief), instead issuing an overbroad injunction causing incalculable damage to PepsiCo's reputation and wasting the millions of dollars PepsiCo spent promoting the product name.

MTN DEW RISE ENERGY is a ***fruit-flavored energy drink*** sold in a large, 16-ounce can, typically purchased in gas stations and convenience stores.  It is an extension of the famed MTN DEW citrus-flavored soda that Americans have been

3

drinking for 70 years. Its association with classic MTN DEW soda is obvious from its packaging. The can prominently features the MTN DEW house brand along with bright neon colors and a large, stylized lion logo composed of the same sharp triangular "shards" that consumers have encountered on cans of classic MTN DEW for decades:

Figure 1: [[Dkt.104.at.3 ¶7, Dkt.104.at.6 ¶14]]

 

MTN DEW RISE ENERGY comes in a variety of flavors, each of which has its own unique color with, for example, bright pink for the "Strawberry Melon Spark" flavor:

Figure 2: [[Dkt.104.at.3 ¶7]]



By contrast, RBC's product—an "organic" nitro-brewed ***coffee***—is sold in a small, 7-ounce can typically found in grocery stores like Whole Foods. It features a muted red-yellow-brown color scheme and a logo depicting a sun:

Figure 3: [[Dkt.29.at.5 ¶15]]



RBC's motion for injunctive relief was based on a "reverse confusion" theory, *i.e.*, that consumers will believe its coffee product is the "coffee version of Mountain Dew." [[Evidentiary.Hearing.Tr.85:1.]] The district court's endorsement of this

theory was based on a series of fundamental legal errors, only some of which are summarized below.

**First,** the court failed to conduct the "holistic" analysis that this Court has established for evaluating the likelihood of marketplace confusion. It cannot be overemphasized that ***these products are nothing alike***. They are in different, well-established beverage product categories and cater to different consumers with different preferences and different needs. They taste completely different. They come in different sizes and, more often than not, are even sold in different stores. But the court brushed aside (or completely overlooked) these critical distinctions, each of which is highly relevant to the ultimate question of confusion. Instead, the court found that the marks were "confusingly similar" based on their common use of the word "rise"—which is the ***only similarity*** between the two products. But this Court has made abundantly clear that the shared use of a common English word like "rise" is not a legally sufficient basis for a finding of likely confusion.

**Second,** the court completely misapprehended the relevance of the common usage of the word "rise" in food and beverage trademarks. ***RBC itself*** acknowledged the relevance of this common usage after the PTO rejected its application to register the predecessor to the very mark it now asserts in this lawsuit, citing potential confusion with similar, pre-existing "rise"-formulated marks used for coffee. In its response letter to the PTO, RBC argued that consumers have grown accustomed to

seeing the word "rise" used in trademarks for coffee and other beverages, and are therefore highly "unlikely [to] give significant weight to this term in ascertaining the source of [] goods." [[Dkt.108-6.at.4.]] As RBC also explained, that means that "multiple Rise-formulated coffee marks" can "peacefully coexist[] without confusion." *Id.* Yet the court gave no weight to RBC's prior representations to the PTO and, with a single sentence, brushed off PepsiCo's substantial evidence of third-party use, calling it irrelevant. This was a critical error. Having registered its own trademarks after arguing that "***there is room for another Rise-formulated mark, particularly one with a completely different appearance and sound***," *id.,* RBC cannot now argue, much less prove, that PepsiCo's "Rise-formulated [MTN DEW] mark"—which also has a "completely different appearance and sound"—will confuse consumers.

***Third,*** the court's conclusion is irreconcilable with the fact that not only did RBC fail to show actual confusion, the evidence decisively showed a complete lack of confusion. PepsiCo's expert conducted and submitted a vigorous survey, following a well-established methodology, to test confusion in the marketplace. The study was conducted ***four months*** after PepsiCo launched its product in 170,000 stores nationwide and widely promoted it with a commercial featuring LeBron James that aired during the NBA playoffs. If any confusion resulted from PepsiCo's sales of MTN DEW RISE ENERGY, it would have been revealed in the survey results. But,

7

when presented with an image of RBC's product, ***not a single survey respondent even mentioned MTN DEW***. RBC, on the other hand, had ample time to conduct and submit a survey, but failed to do so. Instead, it relied on self-serving testimony from its own employees claiming that "business partners," "overnight stockists," and unnamed consumers were apparently puzzled by both parties' use of "rise." That uncorroborated testimony is legally irrelevant for several reasons, including that RBC's isolated anecdotes do not reflect the kind of actual reverse confusion that influences purchase decisions. Yet the district court credited these anecdotes and summarily discarded PepsiCo's survey without properly considering its results or methodology.

***Fourth,*** the court's errors on the merits were compounded by its failure to properly analyze the law of irreparable injury. PepsiCo began releasing information about its product in the fall of 2020. After sending a demand letter in January 2021, to which PepsiCo quickly responded with a substantive, detailed explanation of why the parties' two products can peacefully coexist, RBC fell silent for ***seven weeks***. In a tactical move, RBC waited until ***after*** PepsiCo's nationwide launch to respond, hoping that PepsiCo would be more willing to pay up once it had already introduced its product name to millions of consumers across the country. And, when RBC finally responded, it demanded a "percentage of gross sales" of every single MTN DEW RISE ENERGY product—a windfall that would have dwarfed RBC's annual

8

revenue and enriched RBC's handful of venture-capital investors. When PepsiCo refused to pay, RBC again fell silent for ***weeks*** before filing suit.

These strategic delays contradict and undermine RBC's demand for injunctive relief. If RBC had really believed it would suffer irreparable harm as a result of PepsiCo's product, it would not have waited until ***after*** PepsiCo's launch to file suit. Its decision to wait massively increased the burdens PepsiCo would suffer in complying with the injunction, as by the time RBC filed its motion, PepsiCo was selling millions of cans each week and had already aired a high-profile, celebrity-endorsed television commercial. The district court ignored this context. Worse still, the court required PepsiCo to comply within ***seven days*** and set a mere $250,000 bond (notwithstanding PepsiCo's evidence that its compliance costs would be millions of dollars higher).

This case is a perfect demonstration of why Congress established a right to immediate appellate review of preliminary injunctions. 28 U.S.C. §1292(a)(1). Because the order below was premised on a series of legal errors, and because RBC did not meet its high burden to establish entitlement to the "extraordinary remedy" of preliminary injunctive relief, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), this Court should reverse.

## STATEMENT OF THE CASE

### I.     Factual Background

#### A.     RBC Entered a Crowded Field With Its Choice of Trademark

RBC was founded in 2014, joining scores of other food and beverage companies that use the common English word "rise" in the names of their products. This is not surprising: "rise," which means "to get up from sleep" or, more abstractly, to "exert oneself to meet a challenge" (as in "rise to the occasion") is a simple and evocative term for products that are intended for morning consumption or to otherwise provide an aspirational boost.[1]

RBC sells cold-brewed coffee in 7-ounce cans marked with its RISE BREWING CO. trademark. Other companies (many of which predate RBC) have used "rise" for a wide range of beverages and similar products, like energy drinks (**RISE AGAIN! energy drink**); kombucha (**RISE KOMBUCHA**); instant coffee (**RISE coffee sachets**); mushroom coffee powder (**RYZE mushroom coffee**); mineral water (**VITAMIN WATER RISE**); coffee-based beverages (**NITRO HIGH RISE coffee drink**); yogurt (**RISE yogurt**); coffee beans (**RISE UP coffee beans**); smoothies (**RISE UP acai bowls**), and even beer (**RISE UP coffee stout** and **RISE** beer). [[Dkt.108-5.at.2-10; Dkt.108-2.at.12.]]

---

[1] "Rise," Merriam-Webster, https://www.merriam-webster.com/dictionary/rise (last visited Dec. 27, 2021).

Figure 4: [[Dkt.135-1.at.2-11; Dkt.108-5.at.9]]



Consumers are also accustomed to seeing "rise" in similar categories, like food and nutritional supplements. *See, e.g.*, [[Dkt.108-5.at.2-13.]]

11

Figure 5: [[Dkt.135-1.at.2-11]]










Accordingly, when RBC chose to use the ordinary word "rise" for its company, it knowingly joined a "crowded field" of similar uses of the word for similar products, many if not all of which coexist contemporaneously.

### B.    RBC's Representations To The PTO

In 2015, RBC attempted to register RISE COFFEE CO. with the PTO.  The Office rejected RBC's application, citing a "likelihood of confusion with prior registrations" that also used the word "rise," including RISE UP ORGANIC COFFEE. [[Dkt.108-6.at.2-3.]]  RBC objected and urged the PTO to withdraw the refusal.

RBC expressly relied on the "crowded field" doctrine, which recognizes that where multiple companies use a common term in a particular category, consumers will be "able to distinguish between different [] marks based on small differences in

the marks" and will not be confused unless the overall commercial impression, as encountered by consumers in the marketplace, is essentially identical.  2 McCarthy on Trademarks & Unfair Competition §11:85 (5th ed.).  For example, a shopper might encounter numerous food products using the word "heritage"—*e.g.*, HERITAGE cereal, HERITAGE bread, HERITAGE tea, and HERITAGE soap— without believing that they all originate from a single company.

In its PTO submission, RBC admitted that because "many entities have used the word 'Rise,'" consumers would not assume that two "rise" products originate from a single source merely because both products use the word—***even when the word is used on similar coffee products***.  [[Dkt.108-6.at.4.]]  Instead, consumers "are likely to consider the ***entire mark*** in ascertaining the source of the goods," and will only assume that two products originate from a single source if the products' marks are, as RBC put it, "virtually identical."  [[Dkt.108-6.at.4-5]] (emphasis added).  As RBC explained:

> The fact that there are multiple Rise-formulated coffee marks owned by different registrants ***peacefully coexisting without confusion*** shows that there is room for another Rise-formulated mark, particularly one with a ***completely different appearance and sound***.

[[Dkt.108-6.at.4]] (emphasis added).

The PTO agreed to register RBC's mark after RBC altered it from RISE COFFEE CO. to RISE BREWING CO, suggesting that the PTO believed that the mere addition of the word "BREWING" was sufficient to differentiate RBC's new

13

mark from the numerous pre-existing "rise" marks. [[Dkt.80-1.at.2; Dkt.80-1.at.9.]] RBC's registered logo, designed to mimic rays of sunshine, is shown below (the "Sun Logo"):

Figure 6: [[Dkt.80-1.at.9]]



In 2016, RBC launched its canned coffee product. [[Dkt.29.at.2 ¶4.]] RBC refined its packaging over the next few years, retaining the Sun Logo and accompanying red-yellow-brown visual theme:

Figure 7: [[Dkt.29.at.2-5 ¶4-15; Dkt.106-3.at.2]]

   

RBC aimed to compete in the $3 billion category of "ready-to-drink coffee"

beverages led by Starbucks and Dunkin' Donuts. [[Evidentiary.Hearing.Tr.100:10-21.]] As RBC grew, it relied on a group of 30 investors to fund its operations. [[Evidentiary.Hearing.Tr.53:15-17.]]

### C.    RBC Unsuccessfully Pursued Acquisition By PepsiCo

Like many venture-backed companies, RBC almost immediately began exploring an acquisition by a larger, more established player, including PepsiCo. Between August 2017 and September 2019, RBC employees made several unsuccessful attempts to interest PepsiCo in acquiring the company. [[Dkt.29.at.8 ¶24; Dkt.33.at.2-4 ¶¶3-13.]] PepsiCo was not interested, in part because PepsiCo has a long-running joint venture with Starbucks to distribute its popular shelf-stable coffee drinks. [[Evidentiary.Hearing.Tr.102:5-13; Dkt.104.at.7 ¶17.]] Unsurprisingly, RBC's attempts fell short: the PepsiCo Beverages North America employee responsible for considering potential acquisitions or partnerships with other beverage companies was not even aware that anyone at RBC had ever met with anyone from PepsiCo. [[Evidentiary.Hearing.Tr.102:13, 114:2-9.]]

RBC encountered financial difficulties starting around mid-2020. Its sales and market share began to decline. [[Evidentiary.Hearing.Tr.108:17-22, 115:2-9.]] That created negative momentum for the business, which depends on outside capital to fund operations. [[Evidentiary.Hearing.Tr.31:14-25]] (RBC has "about a million

and a half dollars in the bank, which is about 30 days' worth of runway"); [[Evidentiary.Hearing.Tr.54:11-13]] (RBC yet to turn a profit); [[Evidentiary.Hearing.Tr.109:7-18]] (investors "would have been concerned because [RBC's] sales were dropping"). When RBC sought additional funding in February 2021, it raised less than $1 million. [[Evidentiary.Hearing.Tr.51:8-9.]] And by that point, it was clear to RBC and its investors that there was no partnership opportunity with PepsiCo.

### D. PepsiCo Independently Developed A New Energy Drink For Its MTN DEW Product Portfolio

Meanwhile, a dedicated team at PepsiCo's famed North America beverages unit was hard at work on plans to introduce a new product to compete in the $16 billion market for energy drinks (a different beverage category than ready-to-drink coffee) led by Red Bull and Monster Energy. [[Evidentiary.Hearing.Tr.100:22-101:1, 129:10-12; Dkt.105.at.1 ¶3.]] In 2020, PepsiCo started developing such a product under the famous MTN DEW brand. [[Dkt.104.at.2 ¶4.]] Those efforts culminated in the creation of an innovative, caffeinated, fruit-flavored energy drink, featuring functional ingredients like zinc, antioxidants, and vitamins. [[Dkt.104.at.2 ¶5.]]

PepsiCo's marketing team developed a name for the new product: MTN DEW RISE ENERGY. Like numerous companies before it, PepsiCo included the word "rise" to "capture[] the sense of morning energy and new beginnings."

16

[[Dkt.104.at.6 ¶15.]]   The team also developed a packaging design that borrowed

heavily from PepsiCo's pre-existing MTN DEW brand.   PepsiCo's classic MTN

DEW product is shown below:

Figure 8: [[Dkt.104.at.6 ¶¶13-14]]



The packaging design for MTN DEW RISE ENERGY features similar bright,

neon colors and angular design elements:

Figure 9: [[Dkt.35-1.at.49]]



The can prominently displays the MTN DEW house mark as part of the MTN DEW

RISE ENERGY logo. And the centerpiece of the can's design is a large "lion" logo, composed of the same distinctive triangular "shards" associated with MTN DEW's cornerstone soft drink, and "designed to further connote energy and power in a bold, colorful way." [[Dkt.35-1.at.53, Dkt.35-1.at.60; Dkt.104.at.3 ¶8.]] That lion serves as the product's "icon," similar to the "big M on [] Monster [Energy]" or the "two bulls" on a can of Red Bull. [[Evidentiary.Hearing.Tr.121:22-122:3.]]

Every inch of the packaging, promotional materials, and in-store displays featured the same bright, angular visual theme—embodied here by the distinctive "lion" logo—consistent with the already-famous MTN DEW brand:

Figure 10: [[Dkt.35-1.at.47, 50, 59]]

 



18

PepsiCo made sure that the beverage itself was consistent with the MTN DEW beverages that consumers have enjoyed for 70 years. It came in "an array of crisp, clean flavors with names inspired by the creative flavor names of other MTN DEW products" like "Berry Blitz" and "Orange Squeeze." [[Dkt.104.at.2-3 ¶6.]] One publication described the product as "Mountain Dew that's adulting." [[Dkt.35-1.at.48.]]

No one on the PepsiCo team that developed the MTN DEW RISE ENERGY name was aware of RBC or its coffee products when creating that product name. [[Dkt.104.at.7 ¶16.]] It is undisputed that the PepsiCo employees who met with RBC when RBC was seeking an acquisition were not involved in the product's development. [[Dkt.104.at.7 ¶17; Evidentiary.Hearing.Tr.104:7-8.]] Simply put, PepsiCo's "inclusion of the word 'RISE' in the MTN DEW RISE ENERGY mark has nothing to do with RBC or its products." [[Dkt.104.at.7 ¶16]] (Testimony of executive hired to supervise the creation and launch of PepsiCo's new energy drink).

PepsiCo would have had no reason to believe that its name of choice would cause any confusion with RBC's product. [[Evidentiary.Hearing.Tr.131:3-11.]] As PepsiCo later explained to RBC in response to its demand letter, the widespread use of the same word on similar food and beverage products indicated the parties' two names could coexist and consumers would understand the difference. [[Dkt.108-8.at.2-5.]] Moreover, any confusion between the products was even *less* likely as

the products at issue were in completely different beverage categories and targeted a different consumer need. PepsiCo's product is an ***energy drink***, which would be sold mostly in small format stores like convenience stores and gas stations, and which would have a sweet, bold taste, just like all MTN DEW products. [[Evidentiary.Hearing.Tr.101:3-8; Dkt.104.at.2 ¶5.]] And it would be marketed with "aggressive imagery," "bright colors," and "fruity flavors" typical of the energy-drink category. [[Evidentiary.Hearing.Tr.101:1-2, 122:16-19.]] RBC's product, by contrast, is a ***coffee***, marketed to consumers with a preference for "organic ingredients" and "non-dairy alternatives" like oat milk, and sold primarily in large format stores, *i.e.*, grocery stores like Whole Foods. [[Dkt.29.at.3 ¶8; Dkt.29.at.7 ¶21; Evidentiary.Hearing.Tr.100:14-18.]] And it was marketed as such, with "brown or tan colors" and words like "Latte" and "Brew." [[Dkt.104.at.4 ¶11; Evidentiary.Hearing.Tr.101:2-3.]]

### E.    RBC Sent A Demand Letter And Then Went Silent

RBC learned of PepsiCo's new product after PepsiCo began to release information about it in the fall of 2020. [[Dkt.104.at.8 ¶20; Evidentiary.Hearing.Tr.42:19.]] RBC could not have viewed PepsiCo's plans as a threat. As RBC had already admitted to the PTO, its mark could "coexist[]" with numerous other marks—even within the coffee category—that include the word "rise," so long as each mark had a "different appearance and sound" that would enable consumers to

20

distinguish them.  [[Dkt.108-6.at.4.]]  And because PepsiCo's *energy drink*—which would feature the MTN DEW house mark and bright, angular design elements—would have a "completely different appearance and sound" than RBC's *coffee* product, RBC could not have believed that it would have any effect on its business.  *Id.*

Despite its prior statements to the PTO, RBC nevertheless sent PepsiCo a demand letter on January 11, 2021.  [[Dkt.108-7.at.2-3.]]  That was two months before PepsiCo's planned March 2021 launch.  PepsiCo's Trademark Counsel replied with a detailed, substantive response 15 days later, on January 26, 2021.  [[Dkt.108-8.at.2-5.]]  With echoes of RBC's argument to the PTO, PepsiCo pointed out that RBC's marks exist in a crowded field of more than 30 other active registrations or allowed applications that include the word "rise," and that it was therefore "highly doubtful that anyone would confuse or mistakenly associate" the parties' products.  [[Dkt.108-8.at.3-4.]]  PepsiCo included examples of the MTN DEW RISE ENERGY logo, pointing out the stark differences between the parties' marks.  [[Dkt.108-8.at.2-3.]]  PepsiCo asserted it was "well within its rights" to continue with its planned launch and invited RBC to contact PepsiCo's counsel for further discussion.  [[Dkt.108-8.at.5.]]

PepsiCo's response was met with silence.  With no indication that RBC disagreed with PepsiCo's detailed response to its demand letter or intended to pursue the matter any further, PepsiCo continued to invest in the MTN DEW RISE ENERGY

product line.  It spent millions on marketing and announced a sponsorship agreement with LeBron James to promote its new energy drink.  [[Dkt.104.at.9 ¶23.]]  Despite this flurry of activity, RBC sat on its hands for *seven weeks*, without a single follow-up email or phone call.  [[Dkt.29.at.11 ¶34.]]

### F.    RBC Demanded A Windfall Following PepsiCo's Launch

PepsiCo commenced the nationwide shipment of MTN DEW RISE ENERGY to over 170,000 retailers on or about March 15, 2021, spending millions on making a big splash: within 48 hours of the launch, PepsiCo generated between four and five billion media impressions for the product, roughly the same as a Super Bowl ad.  [[Dkt.104.at.2  ¶4;  Evidentiary.Hearing.Tr.124:23-125:12,  141:19-21.]]    Sales quickly accelerated, amounting to about $100 million in revenue by October.  [[Evidentiary.Hearing.Tr.127:5-12.]]

Only after PepsiCo launched its product did RBC break its silence.  It sent a second letter to PepsiCo on March 16, 2021, which then sparked a quick exchange of letters and phone calls, with the parties exchanging letters on March 30, April 6, April 12, April 15, and April 23.  [[Dkt.29.at.11 ¶35.]]  During this correspondence, RBC's goal became clear: it demanded that PepsiCo pay RBC a "percentage of gross sales" of every MTN DEW RISE ENERGY product.   [[Evidentiary.Hearing.Tr.43:19-44:18.]]  In other words, RBC waited to press its purported rights until

*after* PepsiCo introduced its product to consumers. And, after the launch, RBC demanded a windfall that would have dwarfed RBC's revenue, decisively solved its cash flow problems, and massively increased its value as an acquisition target.

When PepsiCo refused to pay, maintaining its position that the products could coexist without confusion, RBC again sat on its hands. PepsiCo continued to distribute and promote its product, and RBC failed to send PepsiCo a single follow-up letter, much less seek swift relief in court.[2] On June 15, 2021, RBC finally filed suit. But it did so in the Northern District of Illinois—not in New York, where PepsiCo is headquartered and where RBC was founded—citing a single grocery store employee in Illinois who was allegedly "confused" by PepsiCo's product. SDNYDkt.61 at 4; SDNYDkt.20 at 3-4. On June 26, 2021, RBC filed a motion for a preliminary injunction. SDNYDkt.25. By that time, another **seven weeks** had passed since the parties had last discussed the issue outside the litigation context. And RBC had known of PepsiCo's concrete plans to launch MTN DEW RISE ENERGY—along with its chosen logo and plans to market and promote the product—for **over six months**. *See* [[Dkt.108-8.at.2.]]

## II.    Procedural Background

After PepsiCo successfully moved to transfer the case to the Southern District of New York, RBC filed a motion for a preliminary injunction in that Court on July

---

[2] PepsiCo and RBC discussed the issue via telephone on May 10, 2021.

26, 2021. SDNYDkt.81. On October 8, the court held a remote evidentiary hearing, during which PepsiCo presented, among other things, evidence that complying with the injunction would be "massively disruptive" and lead to wasted inventory, re-branding costs, reputational harm, and $5.6 million in lost media spend. [[Eviden-tiary.Hearing.Tr.142:4-143:21; Dkt.104.at.10 ¶27.]]

On November 3, 2021, the court enjoined PepsiCo from using the MTN DEW RISE ENERGY mark or "any mark that is confusingly similar to [RBC's] [m]ark." SDNYDkt.148. The next day, the court amended the order without altering its sub-stance. [[Dkt.149.at.1-24.]] The order required PepsiCo to comply within seven days, and set a $250,000 bond without any discussion of PepsiCo's evidence show-ing that its anticipated costs of compliance dwarfed that amount. [[Dkt.149.at.23.]]

PepsiCo promptly moved for a stay pending appeal, SDNYDkt.151, which the district court denied, citing its preliminary injunction order, SDNYDkt.156. Pep-siCo then moved for a stay in this Court, CA2Dkt.10, and on November 9, 2021, the Court administratively stayed the injunction pending further review, CA2Dkt.31. On December 7, 2021, a motions panel terminated the stay but expedited the appeal. CA2Dkt.76.

## SUMMARY OF ARGUMENT

RBC failed to prove the critical elements of its preliminary injunction motion:

24

likelihood of success on the merits and irreparable harm.  The district court's injunction was premised on a series of legal errors and is inconsistent with this Court's precedent on likelihood-of-confusion analysis and the law of injunctive relief.

The court applied the incorrect legal standard to numerous *Polaroid* factors. *First,* the court improperly evaluated the strength of RBC's mark and failed to account for the fact that RBC's claim hinges solely on PepsiCo's use of a common English word that (as RBC admitted) is widely used on other similar products and thus unlikely to be understood by consumers as an indicator of source.

*Second,* the court erred by focusing on the minor similarities between the parties' packaging rather than on the far more relevant differences.  The court failed to consider the "overall impression" of the parties' packaging designs, including PepsiCo's prominent inclusion of the MTN DEW house brand, which weighs strongly against a finding of confusion.

*Third,* PepsiCo's survey evidence decisively proved that its product will not cause reverse confusion.  The court discredited that survey without engaging with its results or methodology, instead crediting RBC's self-serving anecdotes, which, even if credible, do not relate to actionable confusion as a matter of law.

*Fourth,* the court failed to adequately analyze PepsiCo's evidence of actual marketplace conditions in finding that the parties' products were in "competitive proximity" and that the "bridging the gap" factor was irrelevant.

*Fifth,* the court improperly concluded that the "quality" factor weighs in RBC's favor. Even assuming there is a disparity in the quality of the parties' products, that would weigh *against* a finding of likely confusion.

*Sixth,* the court failed to account for PepsiCo's evidence of good faith, and failed to weigh RBC's failure to introduce evidence as to consumer sophistication against it.

The district court further erred in its evaluation of irreparable harm and the balance of harms. RBC lay in wait until *after* PepsiCo introduced its product name to millions of consumers to demand a financial payout and, even then, continued to drag its heels. Those facts strongly weigh against preliminary injunctive relief, as do the substantial financial and reputational harms to PepsiCo that resulted from the injunction.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for an abuse of discretion. *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1038 (2d Cir. 1992). A district court abuses its discretion when it makes an error of law or relies on clearly erroneous findings of fact. *Id*.

In trademark cases, this Court reviews a district court's factual findings as to each likelihood-of-confusion factor for clear error, but applies *de novo* review to the

district court's legal conclusions as to each factor. *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 86 (2d Cir. 2020) ("[I]nsofar as the determination of whether one of the *Polaroid* factors favors one party or another involves a legal judgment—which it often does—[this Court will] review that determination *de novo*."). This Court also reviews *de novo* the balancing of factors to determine likelihood of confusion. *Bristol-Myers Squibb*, 973 F.2d at 1043.

## ARGUMENT

RBC failed to prove that it was entitled to a preliminary injunction, and the district court abused its discretion by concluding otherwise. A preliminary injunction is an "extraordinary remedy" that is "never awarded as of right," *Winter*, 555 U.S. at 24, and is warranted only when the movant makes a clear showing of entitlement to relief, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). In this Circuit, a party seeking a preliminary injunction must show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

## I.    RBC Is Unlikely To Succeed On The Merits

Likelihood of confusion is the "key element" of a trademark infringement claim. *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir.

1993).  The plaintiff must prove that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark."  *Id.*; *see also Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998) (infringement requires confusion among "a large number of purchasers").  The "relevant confusion" is confusion that causes "mistaken purchasing decisions"; showing "confusion generally" is insufficient.  *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991).  Further, that confusion must be *probable*; "it is not sufficient if confusion is merely 'possible.'"  *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 121 (2d Cir. 2001) (citations omitted).

This Court evaluates likelihood of confusion based on the factors set out in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961):

> [T]he strength of [the plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the [plaintiff] will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id*. at 495.  "No single *Polaroid* factor is preeminent, nor can the presence or absence of one determine, without analysis of the others, the outcome of an infringement suit."  *Lever Bros. Co. v. Am. Bakeries Co.*, 693 F.2d 251, 253 (2d Cir. 1982).  Evaluation of the *Polaroid* factors is not "mechanical," but rather helps answer the "ultimate question of whether consumers are likely to be confused."  *Nabisco, Inc. v.*

*Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000).

Here, RBC claimed a likelihood of "reverse confusion," which occurs when "a subsequent user [*i.e.*, PepsiCo] selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user [*i.e.*, RBC] are produced by the subsequent user." *Lang*, 949 F.2d at 583. RBC's theory was that, notwithstanding the ubiquitous use of the MTN DEW house brand (and distinctive design elements) on virtually every single MTN DEW beverage in the marketplace, consumers would believe that RBC's canned coffee—which does *not* bear any of the MTN DEW branding elements—was ***the "coffee version" of MTN DEW***. [[Evidentiary.Hearing.Tr.73:12-16, 84:21-85:2; *see also* Evidentiary.Hearing.Tr.164:20-25.]]

Figure 11: [[Dkt.104.at.3 ¶7, Dkt.104.at.6 ¶14]]                Figure 12: [[Dkt.106-3.at.2]]



That theory blinks reality. As explained below, ***none*** of the *Polaroid* factors, properly analyzed, supports RBC's argument as to reverse confusion.

### A. The District Court Improperly Analyzed The "Strength" Factor

Courts analyze the "strength" of a mark to determine the mark's "tendency to uniquely identify the source of the product." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005). Three analyses are relevant here.

Conceptual Strength. Courts analyze a mark's conceptual strength, *i.e.* its inherent tendency to function as an indicator of the source of goods, typically by placing the mark on the well-established distinctiveness spectrum. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976).

Commercial Strength. Courts also analyze a mark's commercial strength, or the actual "mental association in [the] buyer[s'] minds between the [plaintiff's] mark and a single source of the product," often by analyzing the plaintiff's advertising expenditures, media coverage, and sales success. *LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 638-39 & n.26 (S.D.N.Y. 2016). In reverse confusion cases, a showing that the plaintiff's mark has achieved "commercial strength" weighs ***against*** confusion because a plaintiff's commercially strong mark is more likely to be correctly understood by consumers as indicating that the product originated with the plaintiff.

Common & Third Party Usage. Separately, in cases that hinge on the parties' shared use of a particular word or phrase—here, "rise"—courts consider the nature

30

of that word or phrase, including whether it is unique (like a coined word) or com-
mon. When the shared term is an "everyday" word used in its ordinary, plain English
sense, courts find that the term is "weak" because consumers are "extremely un-
likely" to assume that two products are associated with one another solely because
they both use a simple English word. *Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d
999, 1005-06 (2d Cir. 1983) ("plus" is in common usage and thus weak); *Gruner*,
991 F.2d at 1077 ("mere word 'parents' [is] weak").

Similarly, courts analyze how the shared term is used by third parties in trade-
marks for similar or related goods. If the shared term is extensively used by third
parties on similar or related goods, courts find that the term is "weak" because con-
sumers are unlikely to understand the shared term as a symbol for a single source.
*See, e.g.*, *Streetwise Maps*, 159 F.3d at 744. Courts refer to these circumstances as
"crowded fields." 2 MCCARTHY §11:85; *see also* [[Dkt.108-6.at.5]] (RBC arguing
that third-party uses of "rise" on beverages contribute to a "crowded field of similar
marks" where confusion is unlikely unless marks are "virtually identical").

The district court determined that the "strength" factor favored RBC.
[[Dkt.149.at.13.]] The court first analyzed the inherent strength of RBC's RISE
BREWING CO. mark (conceptual strength) and found it to be "suggestive." *Id*. As
to PepsiCo's arguments that "rise" is an ordinary word and is used extensively by
third parties in trademarks for similar products (common usage)—which RBC had

31

already admitted in its PTO filings, *see supra* 13—the court summarily dismissed that evidence, noting that **(i)** courts "do not bind parties to their statements made … [to] the PTO" and **(ii)** the argument is "undercut" by PepsiCo's testimony that the word "rise" has an "emotional meaning." [[Dkt.149.at.14.]]  Lastly, the court noted that "[RBC] has invested more than $17.5 million in promoting its [] marks, and has received a number of awards for its products," but concluded, without discussion, that this evidence (of <u>commercial strength</u>) *favored* RBC, *i.e.* that it made reverse confusion ***more likely***.

The district court's analysis was wrong for at least three reasons.

***First,*** the court incorrectly assumed that RBC's investment in "promoting its 'RISE' marks" and the "awards" RBC has won for its products weighed ***in favor*** of a likelihood of reverse confusion.  Even assuming that the evidence of RBC's advertising expenditures and media coverage suggests that consumers do associate RBC's RISE BREWING CO. mark (and its Sun Logo) with RBC itself, that "mental association" makes it ***less likely*** that consumers would believe that RBC's product is the "Mountain Dew coffee version."

***Second,*** the court failed to account for the common usage of the term "rise" and its relevance to the confusion analysis.  Like numerous other beverage companies, RBC and PepsiCo both use that common English word to market beverages intended for morning consumption.  This Court has repeatedly held that where the

only similarity between the parties' products is a common English word, used according to its ordinary meaning, confusion is "extremely unlikely," particularly when, as here, the visual presentation of the parties' products and logos are dissimilar. *Plus Prods.*, 722 F.2d at 1006; *see also Gruner*, 991 F.2d at 1077-78; *Nabisco*, 220 F.3d at 47 (shared use of word "ICE" unlikely to cause confusion because of differences in "overall look" of products); *Lever Bros.*, 693 F.2d at 254 (shared use of word "AUTUMN" in bread and margarine products not infringing).

The district court's opinion ***does not even acknowledge*** this precedent.  Nor does it acknowledge that "rise" is a common word.  As such, the court overlooked the critical difference between a unique term, like "Pepsi," which carries strong commercial significance due to its primary use as a source-identifier, and a common term, like "rise," which is far less likely to achieve marketplace distinctiveness, particularly when used according to its "primary meaning."  *Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F. Supp. 1185, 1196-97 (S.D.N.Y. 1979), *aff'd* 636 F.2d 1203 (2d Cir. 1980).

This error corrupted the remainder of the court's likelihood-of-confusion analysis.  As then-District Judge Leval explained in the *Procter & Gamble* case—regarding the word "SURE" used in connection with deodorant[3]—that the parties'

---

[3] *Procter & Gamble*, 485 F. Supp. at 1196-97 ("As a name for an anti-perspirant deodorant," the plaintiff's SURE mark was "inherent[ly] weak[]" because it uses "one of the most common adjectives in the English language accurately spelled to

shared term is a common English word necessarily affects the analysis of the other

*Polaroid* factors—in particular, the "similarity" factor:

> When arbitrary or fanciful marks are involved, the distinctiveness of the marks will make the public more conscious of similarities than differences … In contrast[,] when common words are involved as they are here, the degree of difference rather than the degree of similarity is likely to be more noticeable.

*Id*. at 1197; *see also Nabisco*, 220 F.3d at 47-48 (where common word at issue, focusing on the "differences between the respective packages," which "dispel completely any [] confusion").

 **Third,** the court also failed to consider the extensive evidence of third-party

usage of the term "rise" in trademarks for beverages and related products.  As ***RBC***

***itself*** explained to the PTO:

> As a result of [consumers] being exposed to numerous [] marks containing "Rise" … ***the shared term "Rise" is extremely weak and diluted,*** such that it creates little source identifying significance that could contribute to any likelihood of confusion ….

[[Dkt.108-6.at.4-5.]] (emphasis added).

 RBC is not the first markholder to obtain a registration by telling the PTO that

their marks can "exist[] together in the marketplace" with prior marks using the same

common term, and then to later sue a new entrant solely on the basis of its use of the

same term.  *See, e.g.*, *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463,

---

boot, to convey, through that word's primary meaning, a quality of the product or of a promised consumer reaction to its use").

476 (3d Cir. 2005). In such cases, courts often weigh these prior statements against the markholder. *Id.* Here, however, the district court disregarded RBC's prior admissions, noting that "courts do not bind parties" to their prior statements. [[Dkt.149.at.14]] (citation omitted).

But this refusal to acknowledge the contradiction between RBC's prior admissions and its litigation position makes no sense. *Cf. Freedom Card*, 432 F.3d at 476 (prior statements to the PTO "undermine" plaintiff's attempt to establish confusion). RBC relied on the argument that its mark would not create confusion with other "rise"-based ***coffee*** marks as part of efforts that led to its current registration. It cannot now assert that another "rise"-based mark for a product in an ***entirely different category*** would somehow cause confusion.[4] To afford no evidentiary weight whatsoever to the statements a markholder made in pursuing its trademark registration (as the district court did) would be to *encourage* markholders to first obtain registrations by convincing the PTO that their marks can co-exist with marks using

---

[4] The inconsistencies in RBC's arguments do not end there. RBC recently filed a lawsuit against a beverage manufacturer asserting that RBC's "rise"-formulated marks do not create a likelihood of confusion with the manufacturer's RIZE-branded energy drinks. *See* Complaint *in RiseandShine Corp. d/b/a Rise Brewing v. Hendricks*, No. 1:21-cv-00232 (Dkt. No. 1) (W.D.N.C., *filed* Aug. 1, 2021). The district court agreed to "consider" this lawsuit, but failed to analyze the conflict between RBC's position in that suit and its argument that consumers will be confused by PepsiCo's MTN DEW RISE ENERGY product. [[Dkt.149.at.7 n.1.]]

the same common word, and then to use those registrations to bring predatory infringement suits against others who want to do the same thing.

PepsiCo presented evidence of **(i)** over 100 real-world uses of the term "rise" in connection with coffee, tea, bottled beverages, canned energy drinks, soft drinks, drinkable health supplements, cafes, yogurts, and granolas, *see* [[Dkt.108-5.at.2-13]]; **(ii)** 15 federally registered marks for coffees, teas, and similar products that contain the word "rise," at least 11 of which predate RBC's marks, *see* [[Dkt.108-1.at.2-16]]; **(iii)** 15 federally registered marks for soft drinks and other beverages (including energy drinks) that contain the word "rise," at least 11 of which predate RBC's marks, *see* [[Dkt.108-2.at.2-16]]; and **(iv)** roughly 30 additional active registrations or applications for trademarks that include the term "rise" for beverages and breakfast foods or snacks, one of which is an allowed application by The Coca-Cola Company for DIET COKE RISE, which RBC did not oppose (despite its opposition to other similar applications for marks like ACAI RISE), *see* [[Dkt.108.at.2-6 ¶4; Dkt.108-5.at.2-13; Dkt.29.at.9 ¶26]].

The court refused to grapple with this evidence, instead noting, in a single sentence without any further discussion or elaboration, that "[RBC] appears to have been the exclusive user of the principal term 'RISE' to identify a single-serving, canned caffeinated beverage." [[Dkt.149.at.13.]] This was legal error. As an initial matter, the district court's *invented* category of "single-serving, canned caffeinated

beverage[s]" is not a meaningful marketplace classification that is relevant to consumers. [[Evidentiary.Hearing.Tr.99:10-14.]] Even more problematically, this Circuit has repeatedly considered third-party usage of a common term in categories *adjacent to* the product categories at issue when evaluating common usage. *See Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1511 (2d Cir. 1997) (vacating injunction where district court's finding as to strength was "clearly erroneous" and undercut by evidence of more than 70 trademark registrations incorporating the relevant term, only some of which were for cosmetic products similar to the parties'); *W. Publ'g Co. v. Rose Art Indus., Inc.*, 910 F.2d 57, 61 (2d Cir. 1990) (considering "over 2,000 trademarks incorporating the [shared] term," only "113 of which are registered in the toy, game and paper products fields").

PepsiCo's evidence of third-party use—which included numerous uses *within* the directly relevant categories of coffee and energy drinks—decisively established that RBC's marks exist in a "crowded field," such that (as RBC itself put it) RBC's marks "should be given a narrow scope of protection" against only "virtually identical marks." [[Dkt.108-6.at.5.]] The district court's refusal to even consider that evidence (or give any weight to RBC's prior admissions) was legally erroneous and impossible to reconcile with this Court's precedent.

## B. The Marks Are Not Similar

The court also erred in its analysis of the similarity of the trademarks. The

relevant inquiry is whether the marks create the same "general impression … taking into account all factors that potential purchasers will likely perceive and remember." *Lang*, 949 F.2d at 581; *Star Indus.*, 412 F.3d at 382 (asking whether marks "create[] a separate and distinct impression" on consumers).  In other words, the court should not myopically focus on any shared term, but should instead analyze each mark as a whole as it would appear to consumers in the actual marketplace.  *Star Indus.*, 412 F.3d at 386; *see also Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 106 (2d Cir. 2009) (same).

When the parties' marks are viewed in terms of "the overall impression created by the logos and the context in which they are found," their differences fall into stark relief.  *Star Indus.*, 412 F.3d at 386.  RBC's logo—and the packaging for the vast majority of its portfolio, including its flagship "Original Black" product—features muted browns, reds, and yellows, along with RBC's Sun Logo showing rays of sunshine.[5]  By contrast, PepsiCo's packaging—which is more than double the volume of RBC's product—features bright neon colors consistent with the color scheme associated with other MTN DEW products.  It does not contain any muted

---

[5] RBC also sells an "Oat Milk Vanilla" beverage in a can that features the same Sun Logo above a sky blue background.  [[Dkt.29.at.5 ¶15.]]  Before PepsiCo's launch, RBC experimented with a handful of other line extensions, including "lemon and blood orange[] coffee beverages" in similarly colored cans, but the record suggests that these products are no longer on the market.  [[Dkt.80.at.4 ¶15; Dkt.29.at.3 ¶8.]] All of RBC's past and current products feature the same muted red and yellow Sun Logo, with the word "rise" in red text.

browns, reds, or yellows, nor does it include anything even resembling a sun.  Instead, PepsiCo's can features the angular style and distinctive "shards" that also appear on other MTN DEW product packaging, along with the dominant lion's head logo.  The products also present the word "rise" with different fonts and colors, with RBC using a simple sans-serif font, and PepsiCo using a jagged and highly-stylized font consistent with the angular style of the rest of the packaging.  And RBC associates the word "rise" with "RISE BREWING CO.," whereas PepsiCo presents "rise" as part of a single whole: "MTN DEW RISE ENERGY":

Figure 13: [[Dkt.104.at.6 ¶13]]          Figure 14: [[Dkt.106-3.at.2]]

          

In short, the only commonality between the two logos is the word "rise."

The district court's opinion *did not even acknowledge those striking difference in the "overall impression" of the products' visual theme, font, color scheme, and logo design*.  [[Dkt.149.at.14-16.]]  The court simply concluded that the parties'

39

marks "are confusingly similar in appearance" on the basis that **(i)** "[b]oth highlight the single word 'RISE'" and **(ii)** on both parties' products, "'RISE' is printed on a beverage can, in large typeface, in all-capital letters, in a bright color against a light background and is the dominant feature occupying the top third of the can." [[Dkt.149.at.15.]]

The court's analysis was legally incorrect for at least three reasons.

***First,*** that two products use the same common English term is not a legally sufficient basis for a finding of confusing similarity. *Nabisco*, 220 F.3d at 47; *Gruner*, 991 F.2d at 1077-78; *Plus Prods.*, 722 F.2d at 1005-06. One party's use of a common English word in a trademark does not "remove [the term] from the general language" or "confer an exclusive right … on variations of the word." *Gruner*, 991 F.2d at 1077-78 (citation omitted); *see also Lang*, 949 F.2d at 581-82 (parties' use of a common phrase as "their focal point" insufficient to establish confusion when the "general impression conveyed to the public … differs significantly"). A ruling to the contrary would make it virtually impossible for new entrants (like PepsiCo) to choose effective trademarks and would further cripple an already depleted trademark domain. *See* Barton Beebe & Jeanne C. Fromer, Are We Running Out of Trademarks? An Empirical Study of Trademark Depletion and Congestion, 131 HARV. L. REV. 945, 951 (2018).

In any case, RBC ***does not have a trademark registration for the standalone***

40

*word "rise,"* nor did it establish any common-law rights in the word.  Nor could it possibly claim exclusive rights to that standalone word, given the numerous third-party uses of "rise" in trademarks for similar products (including beverages), many of which predate RBC.  *See supra* 34.  The district court, however, inexplicably focused on the word "rise," rather than on the registrations at issue (*i.e.*, the RISE BREWING CO. word mark and the Sun Logo, [[Dkt.80.at.15-16 ¶59]]).[6]  Its analysis did not account for the fact that PepsiCo's product does not include the words "BREWING CO." or anything that resembles the Sun Logo.  It even referred to RBC's marks as the "RISE mark," further revealing its untenable assumption that RBC—and only RBC—has the right to use that term.  [[Dkt.149.at.1.]]

Under the court's analysis, each of the numerous third-party uses of the word "rise" would also be confusingly similar to RBC's mark, notwithstanding that each mark differs substantially in its overall appearance.  But as RBC admitted to the PTO, all of these marks can co-exist because, as a result of the extensive third-party uses of the word "rise," the word has "little source identifying significance that could contribute to any likelihood of confusion apart from the cited mark as a whole." [[Dkt.108-6.at.5.]]  That is why, as RBC itself explained, "***multiple Rise-formulated coffee marks … [can] peacefully coexist without confusion***." *Id.* (emphasis added).

---

[6] Notwithstanding RBC's belated attempt to claim "common law rights" in "the mark RISE," SDNYDkt.112 at 6 n.4, the district court's injunction was based entirely on RBC's "registered [] marks," [[Dkt.149.at.1]].

That argument applies with full force here. Because PepsiCo's product has a "completely different appearance" and a different "overall commercial impression," [[Dkt.108-6.at.3-5]], its use of the word "rise" is not a legally sufficient basis for a finding of confusing similarity, and the district court's finding to the contrary was reversible error. *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 394-95 (2d Cir. 1995); *see also, e.g.*, *King Rsch., Inc. v. Shulton, Inc.*, 454 F.2d 66, 68 (2d Cir. 1972) (parties' shared use of phrase "SHIP SHAPE" not confusingly similar because the "packaging techniques … are sharply different").

*Second,* the district court's failure to even consider the stark differences between the parties' two products and branding is irreconcilable with this Court's instruction that "a court should look at the general impression created by the marks, taking into account all factors that potential purchasers will likely perceive." *Lang*, 949 F.2d at 581; *accord. J.T. Colby & Co. v. Apple Inc.*, No. 11-cv-4060, 2013 WL 1903883, at *16 (S.D.N.Y. May 8, 2013) (Cote, J.) (courts look at "the products' sizes, logos, typefaces, and package designs in addition to any other contextual clues that might serve to distinguish the marks") (citation and internal quotation marks omitted), *aff'd*, 586 F. App'x 8 (2d Cir. 2014). This error was particularly pronounced given that a common English word is at issue; in that circumstance, "the degree of difference" between the two products—rather than their minor similarities—"is likely to be more noticeable" to consumers. *Procter & Gamble*, 485 F.

42

Supp. at 1197.

This Court takes a particularly close look at the differences between marks' visual presentations in evaluating similarity. Its opinion in *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, regarding an infringement claim by Starbucks against the manufacturer of CHARBUCKS coffee, is instructive. There, the Court specifically disregarded the similarities between the two words at issue, focusing instead on **(i)** the fact that the defendant's package design was "different in imagery, color, and format from Starbucks' logo and signage," **(ii)** the defendant's presentation of the contested word in the context of other words (like "Mister Charbucks" and "Charbucks Blend"), and **(iii)** the defendant's use of a "graphic of a bear or a male person," which was "not comparable to the Starbucks graphic of a siren in pose, shape, art-style, gender, or overall impression." *Id.* at 106; *see also id.* at 119 (finding no confusion); *Colby*, 2013 WL 1903883 at *17 (two IBOOKS marks not confusingly similar because "the nature of the marks and the context in which they appear" is different).

The same analysis applies here. The two products at issue are completely "different in imagery, color, and format," with PepsiCo's packaging employing bright neon colors and angular shapes and font against a silver background, and RBC's packaging featuring toned-down reds, yellows, and browns. The text on the cans is completely different, with PepsiCo presenting the word "rise" as part of its

43

MTN DEW RISE ENERGY logo, and RBC presenting the same word as part of its RISE BREWING CO. logo. *See Colby*, 2013 WL 1903883 at *17 (marks not confusingly similar because defendant's mark appears "in an Apple-branded environment"). And their imagery is completely different, with PepsiCo's can featuring a massive and stylized lion logo, and RBC's can featuring a peaceful image of a sun.

As a matter of law and common sense, those differences are critical and "suffice to dispel completely any [potential] confusion" arising from the parties' shared use of the common term "rise." *Nabisco*, 220 F.3d at 47-48; *see also Star Indus.*, 412 F.3d at 379-80, 386 (similarity between two marks featuring a "large elliptical letter 'O'" was "tempered by the fact that the respective packaging [of the parties' liquor bottles] is very different"). The district court's failure to even ***acknowledge*** those drastic visual differences was reversible error. *Arrow Fastener*, 59 F.3d at 394-95 (vacating injunction where "total effect" of parties packaging was different, despite use of identical word mark); *see also Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir. 1984) ("[J]uxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar.").

***Third,*** the district court also erroneously discounted the presence of the MTN DEW house mark on the MTN DEW RISE ENERGY can by holding that the presence of a house mark does not dispel reverse confusion. [[Dkt.149.at.15-16.]] But this Court has repeatedly held that the prominent display of a defendant's house

mark tends to do just that. *See, e.g.*, *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 164-65 (2d Cir. 2004). That is true in both the forward confusion and reverse confusion contexts. *See W.W.W. Pharm., Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993). And it makes good sense here: PepsiCo's prominent inclusion of its famous MTN DEW brand on the MTN DEW RISE ENERGY can makes it less likely that a consumer would misconstrue a product that *lacks* the distinctive MTN DEW brand (or any of its distinctive branding elements) as an extension of the MTN DEW line. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 382-83 (2d Cir. 1997) (vacating preliminary injunction where "[the] products bear labels identifying their maker," which "make[s] confusion improbable, even though the two product lines compete in the same market").

## C. PepsiCo Decisively Proved Lack Of Actual Confusion

Notwithstanding that it was RBC's burden to establish a likelihood of confusion, RBC did not put forth any evidence of actual reverse consumer confusion. That lack of "actual confusion" weighs strongly against a finding of likely confusion. *Starbucks*, 588 F.3d at 117; *Nora Beverages*, 269 F.3d at 124 (finding no confusion where the plaintiff "proffered no evidence of direct consumer testimonials or surveys, while [defendant] presented affirmative evidence of no consumer confusion").

As detailed below, RBC relied solely on self-serving anecdotes offered by RBC employees, uncorroborated by any documents or statements suggesting reverse

confusion by third-party witnesses or actual consumers. On the other side of the ledger, PepsiCo offered reliable survey evidence that showed a *lack* of consumer confusion. The district court credited RBC's anecdotes and discredited PepsiCo's survey without seriously engaging with its results or methodology.

### 1. PepsiCo Proved The Absence Of Actual Confusion

As a threshold matter, it cannot be overemphasized that RBC had ample time to conduct a survey to test whether PepsiCo's massive and high-profile launch of MTN DEW RISE ENERGY had actually caused any marketplace confusion in the *seven months* between the launch and the evidentiary hearing (at which RBC submitted its expert's final rebuttal report, *see* [[Evidentiary.Hearing.Tr.153:7-154:10]]). Put simply, if RBC really believed that consumers were confused "as soon as PepsiCo launched" its product, SDNYDkt.82 at 8 (RBC Opening Br.), and that "actual confusion is already rampant throughout the marketplace," SDNYDkt.112 at 2 (RBC Reply Br.), it would have asked its retained survey expert, Leon Kaplan, to test that theory. RBC, however, ***failed to submit any survey evidence***. That failure weighs against a finding of actual confusion. *Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994) (vacating injunction, holding "the lack of survey evidence counts against finding actual confusion").

In stark contrast, PepsiCo offered decisive proof that no reverse confusion will occur through a survey that employed the well-established *Eveready* methodology.

46

*See Koninklijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, No. 11-cv-3684, 2017 WL 3719468, at *33 (D.N.J. Aug. 29, 2017) ("[T]he *Eveready* format is the standard for determining whether there has been reverse confusion … ."). That survey was designed to measure whether MTN DEW RISE ENERGY caused consumers to believe that RBC's coffee products were manufactured by, or associated with, MTN DEW. *See generally* [[Dkt.106-1.at.2-16]]. It was conducted after MTN DEW RISE ENERGY had been widely available (and widely purchased) for over four months. [[Evidentiary.Hearing.Tr.127:7-12.]] PepsiCo's expert surveyed over 600 respondents who had either "purchased a canned or bottled coffee drink in the past month" or were likely to purchase one in the next month—*i.e.*, RBC's target customers, and the relevant audience for a reverse confusion survey. [[Dkt.106-1.at.6]]; 6 MCCARTHY §32:174. Respondents were shown an image of one of RBC's coffee products, and asked **(a)** "Who or what company do you believe makes or puts out the product you just saw?" and **(b)** "What other company or brand, if any, do you believe is associated with, sponsors, or authorizes whoever puts out the product you just saw?" [[Dkt.106-1.at.12.]]

The survey directly tested RBC's core contention: that, as a result of PepsiCo's launch, "customers are thinking that [RBC is] the Mountain Dew coffee version." [[Evidentiary.Hearing.Tr.73:12-16.]] And it decisively disproved it, as ***not a single respondent mentioned MTN DEW***. [[Dkt.106-1.at.13.]]

Courts in this Circuit routinely credit surveys conducted according to the very same methodology that PepsiCo's expert used. *See, e.g.*, *Joules Ltd. v. Macy's Merch. Grp., Inc.*, 695 F. App'x 633, 637-38 (2d Cir. 2017). The district court none-theless disregarded PepsiCo's survey without any serious discussion of its results, methodology, or reliability. The full extent of the court's analysis of PepsiCo's sur-vey consisted of two sentences in which it stated that RBC "proffered its own expert testimony critiquing [PepsiCo's] survey results" (without any further discussion of that testimony) and noted that the survey was "particularly unreliable" because there was not "significant experience of the two trademarks operating side-by-side in the same market." [[Dkt.149.at.18]] (citation omitted).[7]

But PepsiCo's survey was not premature. It was conducted over four months after PepsiCo's nationwide launch of MTN DEW RISE ENERGY,

---

[7] RBC's rebuttal report initially argued that PepsiCo's survey was unreliable because "[RBC's] [] Marks likely do not have high top-of-mind or unaided awareness." [[Dkt.115.at.8 ¶26.]] This made no sense, as PepsiCo's survey was designed to test whether, when consumers encounter RBC's product (including for the first time), they would construe the word "rise" as an indicator that it was the "coffee version of Mountain Dew." Realizing its expert's mistake, RBC then proffered a new ver-sion of the report at the October 8, 2021 evidentiary hearing—well after the close of briefing on RBC's motion—that was lightly revised to argue instead that the survey was unreliable because *PepsiCo's* MTN DEW RISE ENERGY mark had low con-sumer awareness. *Compare id. with* [[Pl.Ex.4.at.7]]. But that too makes no sense: RBC cannot argue that, as a result of PepsiCo's product launch, "actual confusion is already rampant throughout the marketplace," SDNYDkt.112 at 2, while simultane-ously arguing that PepsiCo's mark had not yet achieved sufficient awareness to cause the kind of confusion that would show up in PepsiCo's rigorous *Eveready* survey.

[[Dkt.104.at.2 ¶4]], which RBC itself described as a "high visibility marketing campaign," [[Dkt.1.at.17 ¶62.]] By that date, PepsiCo had spent $20 million to market the product and sold roughly 30 million cans of it in over 170,000 stores. [[Evidentiary.Hearing.Tr.127:7-12; Dkt.105.at.3 ¶9.]] PepsiCo had aired a widely seen commercial featuring LeBron James. [[Evidentiary.Hearing.Tr.124:25-125:2; Dkt.35-1.at.65-66.]] It had invested heavily in in-store displays featuring the new product. [[Evidentiary.Hearing.Tr.127:1-4.]] Within just 48 hours of the launch, PepsiCo had generated between four and five billion media impressions, roughly the equivalent "PR value" of a Super Bowl commercial. [[Evidentiary.Hearing.Tr.124:25-125:12.]] Hundreds of the survey respondents had purchased a ready-to-drink coffee beverage in the past thirty days. [[Dkt.106-1.at.6.]] If, as RBC contended, those consumers were confused "as soon as PepsiCo launched," SDNYDkt.82 at 8, that confusion would have been evident by the time PepsiCo conducted its survey.

Where, as here, there is no survey evidence showing actual confusion, and the only available survey shows an absence of consumer confusion, the "actual confusion" factor cuts decisively in favor of the defendant. In fact, ***PepsiCo is aware of no other example of a district court in this Circuit granting a preliminary injunction in a trademark case where the only available survey data showed an absence of consumer confusion.*** *Contra, e.g.*, *Citigroup Inc. v. AT&T Servs., Inc.*, No. 16-

49

cv-4333, 2016 WL 4362206, at *10-11 (S.D.N.Y. Aug. 11, 2016) (denying preliminary injunction and finding no actual confusion based on defendant's *Eveready* survey evidence showing no confusion); *Essence Commc'ns., Inc. v. Singh Indus., Inc.*, 703 F. Supp. 261, 269 (S.D.N.Y. 1988) (where defendant submitted survey finding no confusion, holding that "actual confusion" factor "strongly favors defendants," and denying preliminary injunction).

### 2. The District Court Improperly Considered RBC's Anecdotal Evidence, Which Was Not Probative Of Reverse Confusion

Instead of giving proper weight to PepsiCo's survey evidence, the district court instead relied on legally irrelevant and self-serving anecdotes offered by RBC employees, none of which was probative of reverse confusion as a matter of law.

As a threshold matter, ***none of RBC's supposed confusion testimony was corroborated*** by any documents or other evidence upon which courts typically rely. 4 MCCARTHY §23:14. For example, despite both parties maintaining active social media accounts for their respective products, [[Dkt.35.at.4 ¶7]], RBC did not introduce any evidence that anyone in the social media universe believed that RBC's product was the "coffee version of Mountain Dew." This total absence of ***actual evidence*** of reverse confusion is telling and should have weighed in PepsiCo's favor. *See Star Indus.*, 412 F.3d at 388 (no actual confusion where plaintiff's evidence "consisted entirely of testimony by several interested witnesses recounting a handful

50

of anecdotes, including a number of hearsay statements by unidentified and uniden-

tifiable declarants").

Even accepting RBC's anecdotal evidence as an evidentiary matter, however,

it was legally insufficient to show actionable confusion.

*First,* almost all of RBC's anecdotes on confusion relate to retailers or other

businesses being confused after an RBC employee orally used the word "rise"—and

*only* the word "rise"—to refer to RBC's product.  *See, e.g.*, [[Dkt.32.at.1-2 ¶3]]

(RBC employee testifying that "[m]y reference to our product as just 'Rise' … had

confused [a retail manager]").  That is not trademark confusion.  Ownership of its

RISE BREWING CO. trademark does not confer upon RBC the exclusive right to

use the word "rise."  *See Gruner*, 991 F.2d at 1077-78.  Again, RBC *does not have*

*a trademark registration for the standalone word "rise."*  [[Dkt.80.at.15-16 ¶59.]]

That RBC's employees used a common English term as shorthand for the name of

their own company and were subsequently misunderstood by *retailers* does not in

any way establish that *consumers, when presented with RBC's actual branded*

*product and logo* (as PepsiCo's survey respondents were), will believe that product

is somehow affiliated with MTN DEW, despite the absence of the MTN DEW house

mark (or anything that resembles it) on its packaging.  RBC's reliance on these ir-

relevant anecdotes is particularly striking in light of its admission, in its arguments

to the PTO, that "'Rise' is not the dominant portion" of its mark and that numerous

coffee companies could use the standalone word "rise" and "peacefully coexist[]" without confusion."  [[Dkt.108-6.at.5.]]

   ***Second, none*** of RBC's anecdotes suggests any marketplace confusion that affected an actual purchasing decision by a consumer.  *Merriam-Webster*, 35 F.3d at 72 (anecdotal evidence not probative of actual confusion where there was no testimony from a consumer "who intended to buy [the plaintiff's product] but mistakenly bought [the defendant's] because of confusion").  This Court has explained that "the relevant confusion is that which affects 'the purchasing and selling of the goods or services in question,'" and not "confusion generally."  *Lang*, 949 F.2d at 583 (in reverse confusion case, disregarding plaintiff's evidence of "four hundred phone calls and several letters … reflect[ing] some sort of confusion," finding that "there is no reason to believe that the confusion represented by the phone calls could inflict commercial injury").  ***None*** of RBC's anecdotes even ***suggest*** that anyone mistakenly purchased (or declined to purchase) an RBC product thinking that it was the "coffee version of Mountain Dew."  [[Evidentiary.Hearing.Tr.85:1.]]  Instead, RBC submitted only uncorroborated testimony regarding "business partners" and often anonymous retail employees.  *See, e.g.*, [[Dkt.31.at.1 ¶2.]]  To the extent the district court relied on these irrelevant anecdotes, it committed reversible error.  *Merriam-Webster*, 35 F.3d at 72; *see also Trs. of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 747 (S.D.N.Y. 1997) (discrediting anecdotal

actual confusion evidence regarding "isolated expressions of momentary confusion" that did not "lead[] to actual purchasing decisions").

**Third,** the majority of RBC's anecdotes, even assuming they are credible and actually relate to marketplace confusion, relate to **forward** confusion (*i.e.*, an alleged belief that MTN DEW RISE ENERGY is an RBC product). *See, e.g.*, [[Dkt.113.at.2 ¶5]] (marketing manager thinking that MTN DEW RISE ENERGY was "[RBC's] product"); [[Dkt.113.at.3-4 ¶¶7-9]]; [[Evidentiary.Hearing.Tr.76:15-19]]. But any evidence that "consumers erroneously believed that the *senior user* [RBC] was the source of the *junior user's* [PepsiCo]" product is "not relevant," as a matter of law, to RBC's claim of reverse confusion—the sole basis of RBC's motion. *Lang*, 949 F.2d at 583. RBC acknowledged as much. SDNYDkt.112 at 3.

**Fourth,** RBC relied on anecdotes relating to **questions** about the relationship between the parties' two products. *See* [[Dkt.31.at.1 ¶2; Dkt.31.at.1-2 ¶3; Evidentiary.Hearing.Tr.84:21-85:2.]] But as this Court has made clear, "[i]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion" but rather indicate "a *lack* of confusion between the products such as to inspire the inquiry itself." *Nora Beverages*, 269 F.3d at 124 (evidence of "distributor inquiries to [the plaintiff's] sales managers" not relevant).

Accordingly, **none** of the anecdotes offered by RBC is relevant to the reverse

confusion analysis. Yet the court credited them, without any explanation or discussion, simply stating that RBC's employees "describe[d] multiple instances of actual confusion." [[Dkt.149.at.18.]]

**Lastly,** even if RBC's anecdotes were probative of reverse confusion, that evidence at most amounted to *de minimis* support for a claim of actual consumer confusion. *Nora Beverages*, 269 F.3d at 124.

### D. The Products Are Not Proximate

Consumers are *more* likely to believe two products originate from a single source if they target the same audience—either because they are directly competitive (like two varieties of stout beer) or because they are complementary or purchased together (like shampoo and conditioner). *See* 4 MCCARTHY §24:48. Consumers are *less* likely to believe that two products come from the same company when they cater to different consumer needs (like wine and whiskey) or different audiences (like imported Parmigiano Reggiano cheese and Kraft singles). *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 961-62, 967 (2d Cir. 1981) (holding that while a BRAVO "all purpose cracker" and BRAVOS tortilla chips were both "snack foods," the products are not proximate because they target different buyers).

MTN DEW RISE ENERGY drinks and RBC's "organic" cold-brew coffee are not proximate because they are different products in different beverage categories, targeting different consumer segments and different consumer needs. RBC's

core product is a "nitro-brewed" coffee beverage that specifically targets coffee drinkers with a preference for "organic ingredients" and "non-dairy alternatives." [[Dkt.29.at.7 ¶21.]] It competes with companies like Starbucks and Dunkin' Donuts in the "ready-to-drink coffee category," and comes in a small, 7-ounce can typical of the category. [[Evidentiary.Hearing.Tr.100:10-18; Dkt.104.at.4-5 ¶11.]] By contrast, MTN DEW RISE ENERGY is a fruit-flavored energy drink that, like traditional MTN DEW soda, contains caffeine. [[Dkt.104.at.2 ¶5.]] It competes with companies like Red Bull and Monster in the distinct category of "energy drinks," and comes in a far larger, 16-ounce can like many energy drinks. [[Evidentiary.Hearing.Tr.100:22-101:8; Dkt.104.at.4 ¶9.]] It does not come in a coffee or tea flavor. [[Dkt.104.at.9 ¶24.]] More often than not, the products are not even sold in the same stores. [[Evidentiary.Hearing.Tr.21:4-7]] (RBC's product in 20,000 locations, primarily grocery stores); [[Dkt.105.at.3 ¶9]] (PepsiCo's product in 170,000 retailers, primarily convenience stores and similar outlets). And even when the products appear in the same store, they are merchandised separately in different shelf areas (often in different aisles). [[Dkt.105.at.1-2 ¶3.]] (Figure 16, *infra*, shows PepsiCo's product as it is typically merchandised, alongside other energy drinks.)

Figure 15: [[Dkt.108.at.7]]                    Figure 16: [[Dkt.105.at.6]]

      

Notably, RBC admitted to the PTO that confusion between different "rise" marks is not likely within the narrow category of "coffee" products, [[Dkt.108-6.at.4-5]], which means that confusion is even *less* likely between two completely *different* products. The district court glossed over these critical distinctions (and ignored RBC's prior admission), instead reasoning that the products are "both canned, caffeinated drinks." [[Dkt.149.at.16.]] It failed to account for the products' different target audiences and distribution channels, instead finding that the products are "proximate" simply because they are both sold in grocery stores. [[Dkt.149.at.16-17]]; *but see Vitarroz*, 644 F.2d at 967 (that "both products are eventually sold to consumers in retail stores" is of little importance given that plaintiff "targets its product at a distinct group of consumers, who shop for [its product] in specialty stores, many of which do not carry [the defendant's] product").

The district court's reasoning would sweep the parties' products into the same category with caffeinated soda, green tea, caffeinated seltzer, and numerous other dissimilar products targeted to different consumers for different uses. That makes no sense. By inventing an overly broad category to fit both parties' products, the court evaded this Court's precedents requiring an analysis of the "structure of the relevant market" for the purpose of analyzing the "proximity" factor. *Vitarroz*, 644 F.2d at 967; *see also Hamilton Int'l Ltd. v. Vortic LLC*, 13 F.4th 264, 278 (2d Cir. 2021) (although both parties' products were watches, "proximity" factor weighed against confusion because defendant "catered to consumers interested in antiques related to American history, and [plaintiff] failed to provide any evidence that it sold similar types of watches").

### E.    RBC Failed To Present Evidence As To "Bridging The Gap"

After incorrectly concluding that the parties' products were "in competitive proximity," the district court compounded its error by finding that the "bridging the gap" factor was therefore "inapplicable." [[Dkt.149.at.17.]] Because there was no evidence that RBC intended to "bridge the gap" into energy drinks, nor would PepsiCo ever use its MTN DEW mark on a coffee product (not least due to its preexisting partnership with Starbucks, *see* [[Dkt.104.at.7 ¶17]]), RBC failed to establish this factor, which therefore should have weighed in PepsiCo's favor.

**F.      The District Court Incorrectly Analyzed The "Quality" Factor**

The district court found that the "quality" factor "weighs in favor of finding a likelihood of success on the merits" after finding that PepsiCo's products "are not organic and could tarnish [RBC's] reputation as a provider of health and organic products." [[Dkt.149.at.19.]]  As a preliminary matter, RBC submitted no evidence as to the products' relative "quality," and the district court's conclusion that RBC was at risk of "tarnish[ment]" was pure speculation.  In any case, even accepting this *arguendo*, that finding would cut *against* confusion, not favor it.  Courts evaluate "quality" because if there is a gap between the qualities of the parties' products, buyers will be *less* likely to assume that they are related.  *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 461 (2d Cir. 2004).  And, as this Court has held, the risk of tarnishment relates to the *result* of marketplace confusion, not its *likelihood*.  *Id.*

**G.      The "Bad Faith" Factor Favors PepsiCo**

The district court placed no weight on the "bad faith" factor.  [[Dkt.149.at.18-19.]]  RBC's claim that PepsiCo "copied" its idea to use the word "rise" is belied by the record, which conclusively establishes that no one involved in the development of MTN DEW RISE ENERGY had any interaction with RBC prior to selecting the name for that product.  [[Evidentiary.Hearing.Tr.101:19-105:17, 117:25-118:15]]; *see Freedom Card*, 432 F.3d at 480 (contact with employees of trademark holder not

relevant where allegedly communicating employees "had no involvement in the development" of the accused product). There is no evidence that PepsiCo intended to "capitalize on [RBC's] reputation" and "promote confusion" between the marks, and RBC does not argue otherwise. *J.T. Colby*, 586 F. App'x at 11 (alteration omitted). To the contrary, PepsiCo presented evidence that, like numerous other beverage companies, it used the word "rise" in the name of its new product to "reflect the product's characteristics," which "support[s] a finding of good faith." *Lang*, 949 F.2d at 583; *see* [[Dkt.104.at.6 ¶15.]] This factor thus should have weighed in *PepsiCo*'s favor.

### H. RBC Failed To Introduce Evidence As To Buyer Sophistication

The district court also held that the "buyers' sophistication" factor was "inconclusive" because RBC "offered no evidence to show low buyer sophistication." [[Dkt.149.at.19.]] As RBC bears the burden of proof, however, and RBC failed to present any such evidence, this factor weighs in PepsiCo's favor. *Courtenay Commc'ns Corp. v. Hall*, No. 01-cv-2228, 2007 WL 2089359, at *7 (S.D.N.Y. July 20, 2007).

### I. Balancing the Factors Shows The Absence Of Confusion

As explained *supra*, the district court not only applied the incorrect legal analysis to numerous factors, but also failed to consider the relationship between those factors. *See supra* 33. Because the factors strongly favor PepsiCo, the district court

erred in finding that RBC had demonstrated a likelihood of confusion and a likelihood of success on the merits.

## II.    RBC Would Not Suffer Irreparable Harm Absent An Injunction

RBC was not entitled to a presumption of irreparable harm because it did not establish a likelihood of success on the merits of its reverse confusion infringement claim.  15 U.S.C. §1116(a) (rebuttable presumption of irreparable harm applies only "upon a finding of likelihood of success on the merits").

Even if RBC were entitled to such a presumption, PepsiCo rebutted it.

*First,* RBC's months-long delay in seeking preliminary injunctive relief undercuts any claim of irreparable injury, particularly given the facts of this case, where RBC knew of PepsiCo's planned use, yet waited for PepsiCo to launch and promote its product for months before seeking a preliminary injunction.  PepsiCo began communicating its intention to use the name MTN DEW RISE ENERGY in the ***fall of 2020***, months before its planned launch in ***March 2021***.  [[Dkt.104.at.8 ¶20.]]  If RBC were at all concerned that PepsiCo's use of the word "rise" would harm it, RBC would have tried to stop that launch.  Tellingly, however, RBC failed to seek injunctive relief in the appropriate venue until ***July 2021***.  This delay undermines RBC's belated demand for a preliminary injunction.  *See Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 967-68 (2d Cir. 1995) (vacating preliminary injunction where delay negated presumption of irreparable harm).

The district court disregarded this evidence of a lack of irreparable injury because the parties were in "ongoing discussions" during the delay. [[Dkt.149.at.20-21.]] But the parties were not in "ongoing discussions" after PepsiCo's January 26 response to RBC's demand letter laying out the clear reasons why RBC's allegation of confusion was meritless. After receiving that letter, RBC fell silent for ***seven weeks***. RBC waited until ***after*** PepsiCo launched its product to respond, presumably in the hopes that it would have more leverage to demand that PepsiCo pay it a "percentage of gross sales" once PepsiCo had introduced its product name to millions of consumers. *See supra* 21. This plainly strategic behavior undermines any argument of irreparable harm. *See Century Time Ltd. v. Interchron Ltd.*, 729 F. Supp. 366, 368 (S.D.N.Y. 1990) (where plaintiff waited to file for TRO until days before launch, denying relief and noting "[w]e simply cannot tolerate tactical maneuvering, in injunction matters, whereby parties sit back and wait for what they believe to be timing most injurious to … their adversaries"); *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, No. 86-cv-6159, 1987 WL 6300, at *3 (N.D. Ill. Jan. 30, 1987) (where plaintiff "knew that [defendant] was about to introduce [its] product" and nonetheless "wait[ed] three months before filing suit while [defendant] was spending substantial amounts to market its product," denying injunction because plaintiff failed to make "an active attempt" to pursue its rights).

Nor were the parties in "ongoing discussions" during the ***seven weeks*** between

the end of the parties' correspondence and RBC's preliminary injunction motion in the Northern District of Illinois. *See supra* 23. RBC provided no real explanation for this delay, which alone should have precluded injunctive relief. *See Life Techs. Corp. v. AB Sciex Pte. Ltd.*, No. 11-cv-325, 2011 WL 1419612, at *7-8 (S.D.N.Y. Apr. 11, 2011) (holding that delay precluded preliminary injunction and dismissing plaintiff's explanation that it was "conduct[ing] internal meetings to formulate a response" during that time); *Century Time*, 729 F. Supp. at 369 (two month delay between when "plaintiffs knew that the action was not going to be settled" and injunction motion precluded relief).

This Court has found delays of only 10 weeks sufficient to rebut the presumption of irreparable harm. *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276-77 (2d Cir. 1985). It has also found that "[l]ack of diligence, standing alone … [can] preclude the granting of preliminary injunctive relief" by establishing the lack of irreparable harm. *Majorica, S.A. v. R.H. Macy & Co.,* 762 F.2d 7, 8 (2d Cir. 1985). Here, despite its knowledge of PepsiCo's intentions months ***before*** the product launch, RBC waited until ***after*** PepsiCo's product had been in the market for three months before seeking injunctive relief. That kind of "tactical maneuvering" decisively "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Century Time*, 729

F. Supp. at 368; *Citibank*, 756 F.2d at 277. This Court has reversed grants of pre-liminary injunctive relief on these grounds before, *see e.g.*, *Citibank*, 756 F.2d at 277; *Tough Traveler*, 60 F.3d at 967-68, and should do so here.

*Second,* RBC effectively *admitted* that it would not suffer irreparable harm by demanding from PepsiCo a royalty equaling a "percentage of gross sales" of every single MTN DEW RISE ENERGY can. [[Evidentiary.Hearing.Tr.43:19-44:18.]] In other words, RBC conceded that it would have no issue with PepsiCo's launch proceeding undisturbed—as long as it received a financial windfall that would have dwarfed its annual revenue and enriched its investors. That alone pre-cludes a finding of irreparable harm. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1340 (Fed. Cir. 2012) (plaintiff's offer of a license is "evidence that [plaintiff] is not being irreparably harmed and that money damages can adequately compensate" plaintiff).

## III.   The Balance Of Hardships Favored PepsiCo

As PepsiCo explained to the district court, being forced to roll back its launch of MTN DEW RISE ENERGY would cause PepsiCo to incur massive costs, both tangible and reputational. PepsiCo's introduction of the product was a "major launch." [[Evidentiary.Hearing.Tr.127:4.]] LeBron James signed on as a sponsor, appearing in commercials and proudly using the catchphrase "when I rise."

[[Dkt.35-1.at.65-66.]] PepsiCo distributed the product to 170,000 stores and invested over $20 million in marketing the product. [[Evidentiary.Hearing.Tr.127:7-12.]] By the time of the evidentiary hearing, PepsiCo had sold roughly ***50 million*** cans of MTN DEW RISE ENERGY—roughly one for every six people in the country. [[Evidentiary.Hearing.Tr.127:5-12.]] As PepsiCo explained, changing its product name would undermine the awareness PepsiCo had built in the name, potentially causing PepsiCo's hard-won consumer base to go elsewhere. [[Evidentiary.Hearing.Tr.127:16-128:8.]] It would cause reputational damage among PepsiCo's retail and distribution partners, [[Evidentiary.Hearing.Tr.143:6-18]], and require PepsiCo to incur millions of dollars in costs associated with rebranding and re-marketing the product, [[Evidentiary.Hearing.Tr.129:14-25; Dkt.104.at.8 ¶20]]. These kinds of market disruptions weigh against injunctive relief. *Stokely-Van Camp*, 1987 WL 6300, at *2-3.

By contrast, RBC offered only speculation about investor concerns, citing the testimony of one of its own obviously self-interested investors who declined to participate in RBC's most recent funding round because he believed (without basis and with obvious hyperbole) that, if PepsiCo's product remained on the market, "[RBC] will no longer exist in two or three years." [[Evidentiary.Hearing.Tr.58:9-10, 60:25-62:12.]] But of the $28 million of outside investment RBC has raised since 2014, $5 million was raised in June 2021—***after*** PepsiCo's MTN DEW RISE ENERGY

launch—which undercuts RBC's manufactured concern that investor interest has "dried up." [[Evidentiary.Hearing.Tr.31:2, 53:13-17, 54:4-5, Dkt.29.at.2 ¶3.]] And PepsiCo presented evidence that RBC's sales have ***increased***, month-over-month, after PepsiCo's launch in March 2021. [[Evidentiary.Hearing.Tr.108:23-109:3.]]

Given this obvious lack of ongoing harm to RBC, PepsiCo should not have been forced to incur immense economic and reputational costs. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir. 1995) (affirming denial of injunction because "[plaintiff] seeks to enjoin an entire product line, which … would cause [the defendant] considerable hardship far outweighing any speculative possibility that [plaintiff's] goods would be harmed by consumer confusion").

The court thus erred in failing to conclude that the balance of hardships favors PepsiCo. Worse still, the court forced PepsiCo to comply with the injunction in *seven days*, while setting a bond of only $250,000, notwithstanding PepsiCo's evidence that changing its product name would costs millions more. *See supra* 24.

## IV.  The Public Interest Weighed Against Injunctive Relief

The public interest also disfavored an injunction. ***First,*** the district court's edict that no two companies can use the same common English word in a trademark—irrespective of the substantial differences between their visual presentation—would eviscerate the "crowded field" doctrine, putting thousands of businesses at risk of predatory infringement suits and making it even more difficult for

65

new entrants to name their products in a way that resonates with consumers. *See supra* Beebe & Fromer at 951. That is particularly true given the overbroad and undefined nature of the district court's injunction, which prevents PepsiCo from using any mark "confusingly similar" to RBC's mark. [[Dkt.149.at.23.]] In light of the court's conclusion that PepsiCo's mere use of the word "rise" suffices to make the parties' products confusingly similar, that undefined category will limit PepsiCo's ability to talk to consumers about its products and deter good faith competition.

**Second,** enjoining PepsiCo from using the word "rise" from PepsiCo's product resulted in the needless waste of can-bodies, point-of-sale material, and other printed marketing and merchandising assets. [[Evidentiary.Hearing.Tr.128:11-22; 143:6-9.]]

**Third,** the injunction forced PepsiCo to change the name of a product that had been widely sold, promoted, purchased, and enjoyed throughout the country for over seven months. By the time of the injunction, millions of consumers had purchased MTN DEW RISE ENERGY, and still more had learned about the product as a result of PepsiCo's substantial marketing activity, including its LeBron James commercial. Requiring PepsiCo to change its name thus deprived the public of a product whose name they had come to recognize, disrupting consumers' well-settled preferences

and expectations.  [[Evidentiary.Hearing.Tr.127:19-128:6.]]  And it deprived hundreds of thousands of retailers across the country of a product whose name, concept, and positioning they approved of, believed in, and counted on for successful sales.

## CONCLUSION

For the foregoing reasons, this Court should reverse.

Dated:  December 27, 2021

Respectfully submitted,

*/s/ Dale M. Cendali*

Dale M. Cendali
Luke Ali Budiardjo
Kirkland & Ellis LLP
601 Lexington Ave.
New York, NY 10022
Tel: (212) 44604846

Julie M.K. Siegal
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 389-5000

Macey Reasoner Stokes
Christopher E. Tutunjian
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
Tel: (713) 229-1234

*Attorneys for Defendant-Appellant*
*PepsiCo, Inc.*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 13,996 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated:  December 27, 2021           */s/ Dale M. Cendali*
                                    Dale M. Cendali